## No. 6326.

DELPHINE DOLHONDE, CURATRIX, vs. ÉMILE PIERRE LEMOINE ET AL.

Whoever shall claim a right accruing to a person whose existence is not known, must show that such person existed at the time the right accrued.

A fact testified to by competent witnesses, will be accepted as proved, no matter how eccentric it may argue the witnesses to be, if there be no evidence tending to impeach their credibility.

One who sues as curatrix of an absentee for the property of the latter, cannot receive any portion of the property until she has given security.

The curatrix of an absentee has a right to accept, sue for, and recover, any legacy or inheritance which may have fallen to him.

APPEAL from the Fifth District Court, parish of Orleans. *Cullom*, J.

J. Ad. Rozier for plaintiff and appellee:

First—Unless a century has elapsed since the birth of an absentee, his death will not be presumed. 2 M. 138; 9 M. 257; 5 N. S. 668.

Second—We are told that the plaintiff is without interest. *Cui bono,* then, (brief for rehearing, II.) the rendition of such a decree as is solicited by the plaintiff? Complaint is made that your Honors say that the property is to be administered by a curatrix until the year 1916, and is to remain as it were *extra commercium,* etc.

These views were no doubt expressed hastily by the appellants, and a second afterthought would dispel the delusion. In the first place, the presumption is that a community exists. Rev. C. C. 2399. The revenues of the husband's separate estate form part of the community. Glen vs. Elam, 3 A. 611.

This of itself shows the interest of the plaintiff. Besides, in this case, especially, foreign heirs, residing and domiciled in France, cannot be permitted to take such a position. The wife is entitled to support and maintenance. Rev. C. C. 119.

Third—The wife of an absentee who is not separated from him, and who wishes to continue to enjoy the benefit of the community, may preserve the administration of his estate. C. C. 64, 2402.

Fourth—The forum for all parties concerned is the probate court. This is the course indicated in the case of Wilson vs. Smith, 14 A. 370, wherein it is said: "It is established that he once existed, and there is no proof of his decease," and then follows a reference to the article 50, C. C. (old) which requires the appointment of a curatrix.

The custody of the property of the absentee must not be wrested from the probate court without proceedings there and establishing (if the appellants can) the death of Lemoine; otherwise, confusion must follow. In that court all parties can be heard.

Fifth—The probate court has, by judgment rendered, declared Lemoine to be an absentee, his property to be administered under the provisions to be found under the title Absentee. Shall that judgment be annulled in a collateral proceeding? It is unnecessary to give again the numerous decisions quoted by the judge *a quo.* See transcript, p. 148.

Sixth—One witness is sufficient to prove the existence of a person.

Seventh—The curator of an absentee may accept a succession or inheritance in favor of the absentee. C. C. 50, Demolombe, p. 58, § 40.

C. E. Schmidt for defendants and appellants:

First—The testimony of one witness, when the testimony is full of improbable statements, is not sufficient to prove the existence of a person, when the effect of the proof will be to divest a party of property over $500 in value.

Second—As regards the effects of absence upon the eventual rights which may belong to the absentee, they form the subject of a dis-

tinct chapter of the Code under the same title of Absentees, viz.: of chapter 3d. The first two articles of that chapter are the following :

Art. 76. " Whoever shall claim a right accruing to a person whose existence is not known, shall be bound to prove that the person existed at the time when the right in question accrued, and until this be proved, his demand shall not be admitted."

Art. 77. " In case a succession shall be opened in'favor of a person whose existence is not known, such inheritance shall devolve exclusively on those who would have had a concurrent right with him to the estate, or on those on whom the inheritance should have devolved if such person had not existed."

Under this law the right of the living brothers and sister of Eugène Lemoine, and of the children of his predeceased sister, to that portion of the succession of Blineau which he, Eugène, would be entitled to, if his existence were known, appears unquestionable. Marcadé on, the Code, vol. 1, art. 135. See, also, Proudhon, État des Personnes, 3d ed. of Valette, pp. 263 et seq.; Toullier, vol. 1, title iv. sec. '2, Nos. 473 et seq.; Delvincourt, vol. 1, t. v. chap. 3 ; Laurent, vol. 2, pp. 319 to 327.

Three decisions of the Court of Cassation, rendered on the 16th January, 1843, (DeRastignac c. Rolland, DeLenoncourt c. Foubert, DeSaisseval c. Opterre, Dalloz, 1re part. pp. 49 to 52), and referred to by Demolombe, vol. 2, No. 249, sanction the interpretation put upon the law by Delvincourt, as regards alienations to purchasers in good faith. See, also, Chabot des Successions, sur l'art. 756, Nos. 13-15 ; Duvergier de la Vente, vol. 1, No. 225 ; Demolombe, vol. 2, Nos. 243 to 250.

At the time of Mr. Blineau's death, Eugène Lemoine was not known to exist. It has not been proved that he was either then, or at any subsequent time, in existence. Hence, the law denied him any right as legatee to Blineau's estate, and the plaintiff who nevertheless pretends to claim the right that would have accrued to him, had his existence been known, is the one upon whom art. 76 Rev. Code throws the *onus* of establishing his existence, and if she fails to show it, her suit must be dismissed.

Third—Parties regularly in possession of property under a decree regular on its face can be divested by *ex parte* appointment of a curator made by a probate court.

Fourth—The wife of an absentee has no right to the revenues of his property in her possession as curatrix.

Fifth—Before a legatee or his curator can sue any third person detaining the property bequeathed for the possession of the same, it is

imperatively necessary that a delivery of the legacy should have been made on the legal representative or heirs of the testator. C. C. 1626, 1630 ; Marcadé on art. 1014, Code Napoleon, vol. 4 ; Coin Delisle (Don. et Test. on arts. 1014, 1015, C. N. § 18) ; Demolombe (Don. et Test. vol. 4, § 633) ; Laurent, vol. 14, § 62 ; 28 A. 603.

The opinion of the court was delivered by

MANNING, C. J. Delphine Delhonde alleges that her husband, Eugene Lemoine, is an absentee, of whom she has been appointed curatrix, and in that capacity sues for one fifth of certain real estate in this city, said to be worth fifty thousand dollars, and for over two thousand dollars of its rents. Her petition, alleging that her husband had been an absentee since 1860, was filed in court in May 1872, and she was appointed his curatrix in the following month.

A suit for the recovery of the same property included in this suit was instituted in February 1873, and the plaintiff was nonsuited. This action was commenced in November 1874.

Eugene Lemoine, a native of France, came here in 1836 when he was eighteen or twenty years old, and married the plaintiff in 1850. There was no issue of the marriage. He became insane in 1859, and was confined in the city insane asylum. After a few days detention there, he was removed under order of court to the State Insane Asylum at Jackson on the application of the city attorney, supported by the certificate of the city physician that he was affected with *démence*. The petition for his removal states his age to be about forty years. The judgment or order thereupon bears date May 31, 1859.

On the 15th of the previous January, an order of the same kind had been made touching one Charles Bermel, alleged to be affected with intermittent mania, and supposed to be about forty-five years old.

The superintendent of the city asylum certifies that Eugene Lemoine, a Frenchman, aged about forty-five years, was sent to the State insane asylum on June 8, 1859. Lemoine's former partner in business took him down to the steamboat at the wharf in this city *en route* for that asylum in that month, and last saw him on the boat.

The records of the Jackson Asylum have the following entries :

No. 772. Chas. Bermel, nativity France, address N. Orleans, date of admission January 30, 1859.

No. 828. Eugene Lemoine alias Leopold Burmel, admitted June 9, 1859. Discharged recovered, March 9, 1860.

In the discharge-book for 1859 also is this entry ;—828. aged 40 years, Eugene Lemoine, nativity Germany.

Lemoine's former business partner communicated with the officers of the asylum after Lemoine's arrival there, and sent money at differ-

ent times for his use. He was informed by them that Lemoine was getting on very well. He went up to the asylum to see him in 1859—he thinks it was the same year Lemoine was sent there—and he could nowhere be found. His description of his visit shall be given in his own words ;—" We went around the whole place and hunted for him. We went from hill to hill, and the party who was in charge would ask me, whenever we would meet any of the inmates, if that was the man, and I would say no. After hunting as much as we could and not finding him, I went to the office and looked into the book, and there I found his name as having been received. There was no farther record to be found. Then the superintendent said he might be hid in some corner, and if I would wait until dinner-time when the bell would be rung he had no doubt the man would come up. I waited until the bell rung, and we stood at the door, and every man that passed in I was asked if he was the man. I examined each one and he was not amongst them. After they were seated at the table I examined each man while seated, and he was not there."

The management of the asylum at that time must have been of deplorable inefficiency. The superintendent was ignorant of the names of its inmates, and the negligent manner in which the records were kept shews the most culpable carelessness. Copious extracts from those records are in the transcript, introduced to shew a mass of blunders. and inaccuracies, and thus throw doubt upon the entries relative to· Lemoine and Bermel, and give colour to a theory that these were one· and the same person.

The argument that the entry of the discharge of Eugene Lemoine alias Leopold Burmel as recovered, must be false as to Lemoine, because he was said by the physician to have that form of insanity called dementia, and dementia is incurable, loses force when we remember that the certificate of the physician was given only a few days after his attack, and quite too soon for any reliable opinion to be formed by any person of the precise kind of insanity into which it would develope.

Lemoine has never been seen or heard of since, save once in the autumn of 1863, and then only by one person, and that person his brother-in-law, Thiroux. The case hinges upon that event. Thiroux was at Mr. Gayarré's house, five miles from Tangipahoa, at that time. Shortly after mid-day Thiroux was about entering the house, when he saw Lemoine walking back and forth between the house and kitchen, probably expecting, he says, to be called to dinner. He was walking with measured steps, his eyes fixed on his hands in which something not discernible was held. Thiroux had to enter a door, and when about entering, the eyes of the two men met while they were not more than four feet apart. Neither spoke. These two men were on friendly terms and

were allied by marriage. Thiroux saw the husband of his wife's sister the last time in 1859 at his house in this city when his insanity began. He knew that he had been sent to the Jackson Asylum, and had not returned to this city, and yet when he met him not a word was exchanged. "In passing in front of him when our eyes met, he turned his back on me, whether intentionally or not, I can't say. I then said to myself, if you are too proud to recognise me, I am too proud to recognise you." Thiroux did not ask any one at the house if they knew Lemoine or had seen him—did not speak of him to anybody. "He wanted to preserve his *incognito* and I did the same," is the reason he gives for this strange conduct.

Pierre Dolhonde, a brother of the plaintiff, had a house at Tangipahoa in 1863, and says Thiroux staid with him then, and recollects Thiroux' mentioning his having seen Lemoine, but this witness made no inquiry about him, notwithstanding he was the husband of his own sister.

The defendants' counsel argues that Thiroux' conduct indicates extraordinary callousness, or a morbid proneness to take offence at a matter which no man of ordinary judgment or intelligence would construe into a slight. That is true, and Dolhonde's conduct is not less strange, for he must have presumed that his sister, the wife of this unfortunate individual, would have welcomed the tidings of her husband's restoration to health and liberty. Four years had passed since either of these men had seen the husband of one of their nearest relatives. Humanity alone would have suggested that both of them should look after one, whose condition when they last saw him should have attracted their sympathy, and who was in those times of war evidently roaming about purposeless. Their conduct is incomprehensible, but no attempt has been made to shew that either of them is not to be believed. The story that each one tells borders on the incredible, but the only reason furnished us to disbelieve them is the unnaturalness of their conduct. But we all know there is no limit to the eccentricities of men.

The property in question came from Olivier Blineau, who died in this city August 17, 1863, and bequeathed it to the children of his sister, of whom Eugene Lemoine was one. Hence the effort to shew that he was alive at that time. Thiroux is the only person who pretends to have seen him after he was conveyed to the asylum in 1859, and he fixes the date of his vision at about the end of October or November 1863, and states that he knew of Blineau's death then, having seen it announced in the Bee in the previous September. He knew Blineau was Eugene Lemoine's uncle, and must have reasonably supposed that a part of his large property would fall to the hitherto impoverished husband of his wife's sister, and yet we have seen that he did not accost

Lemoine and inquire if he knew of his uncle's death, or say aught else on a subject that one would suppose would have been uppermost in his mind.

In addition to these perplexities we have accounts of Lemoine's death. His uncle Blineau, who had given directions to the asylum to supply him with necessaries at his expense, had intelligence of his death. This is stated by Mr. Carriere, the son-in-law of Blineau and one of his executors, but how or whence the intelligence came is not stated. After Blineau's death, Carriere applied to the plaintiff for information, and she shewed him a letter from the superintendent of the asylum to her, to the effect that it did not appear from the records of the asylum that Lemoine was dead. It was proved that about that time the plaintiff put on mourning, but the proof failed to shew that it was for her husband.

The proof of Lemoine's death fails. Either he was discharged from the asylum as recovered, as the entry in its books shews, or he escaped and was seen for the last time in the autumn of 1863, and thus one of the conditions imposed by the Code is fulfilled by the plaintiff;—whoever shall claim a right accruing to a person whose existence is not known, shall be bound to prove that such person existed at the time when the right in question accrued, and until this be proved, his demand shall not be admitted. Civil Code, art. 77 new No. 76.

This is a literal translation of art. 135 of the *Code Napoleon*, and Marcadé, commenting upon it and those which precede it (arts. 50 *et seq.* new No. 47) calls attention to the difference between certain and eventual rights of an absentee. The distinction is palpable between the right of which an absentee was possessed at the time of his disappearance, and that which accrued afterwards. The arts. 50-76, new Nos. 47-75 treat of the former, and those which follow treat of the latter. Lemoine had no property when he was sent to the asylum. In the language of the Code, he was not possessed of either movable or immovable property within this State. But his disappearance does not date from that time. The defendants' counsel cites Marcadé, who says, if there be any incertitude about the existence of the absentee, he shall be reputed dead, and we must act as if it were certain that he was dead. 1 *Explic. du Code Nap.* p. 339. There is no uncertainty about Lemoine's existence late in the autumn of 1863, and the right to his share of Blineau's bequest accrued the previous August. Marcadé continues;— Si donc la condition opposée était, comme dans le cas du numéro précédent, l'existence de l'ayant droit au moment ou ce droit s'ouvrirait, la demande ne triomphera qu'autant qu'il sera prouvé que cet individu vivait encore à cette époque. Si c'est l'individu en personne qui vient former la demande, lui-même sera la preuve vivante du fait. Mais si

17

aujourd'hui il est mort ou absent, soit declaré, soit seulement présumé ; en un mot, si ce n'est pas lui-même qui agit, mais un représentant, ce sera le cas de demander la preuve que le représenté vivait encore quand le droit s'est ouvert à son profit ; jusque-là, en effet, il n'est pas établi que l'événement qui devait réaliser son droit soit accompli. Eh bien ! c'est là, ni plus ni moins, ce que veut notre art. 135 (which we have already said is copied in our Code) qui serait plus clairement rédigé en ces termes ; Lorsqu'un droit, qui ne competait à une personne que sous la condition qu'elle existerait encore lors de son ouverture, sera réclamé par un représentant de cette personne, ce représentant ne pourra l'exercer qu'en prouvant qu'à cette époque de l'ouverture la personne vivait encore. Ibid. p. 341.

To the same effect are the other French commentators. Proudhon, État des Personnes, p. 263. 1 Toullier, Nos. 473 et seq. 1 Delvincourt, c. 3. The mistake of supposing that these writers sustain the defendants lies in the cardinal error of assuming that Lemoine's disappearance was in 1859 or 1860 at latest, and was thus before the right, now claimed by his curatrix, accrued.

We feel bound therefore to sustain the plaintiff's pretensions in the present proceedings under the proof, and the more so, because if Lemoine should re-appear, his rights will have been protected, whereas a contrary decree would leave the defendants to do with the property as they willed.

The plaintiff cannot receive, as his curatrix, any portion of the property or rents until she has given security which we must presume was required when she qualified, and which can be required by those interested, if it is not already given.

Judgment affirmed.

## ON REHEARING.

DeBLANC, J. It was not proven, and we cannot presume that Eugène Lemoine is dead, and—as it stands uncontradicted—we cannot disbelieve the sworn assertion that he was alive when Blineau died ; and—nevertheless—it was on the faith of an adverse assertion, that his co-legatees claimed and were allowed the joint legacy from Blineau to them.

Presuming—as they did—that Eugène Lemoine had died before Blineau, the executors of the latter's will did not cause him to be represented, in the proceedings which resulted in the delivery of the deceased's legacies, and—though he was then alive—the share to which he

was entitled under said will, passed to, and is now in the possession of his co-legatees.

His wife, who was regularly appointed and has qualified as his curatrix, brought this suit to recover the property embraced in the legacy from Blineau to him, and her demand is resisted by the co-heirs of the absentee, on several grounds, one of which has been urged but since we granted their application for a rehearing of this cause, and it is, "that, not being an heir, legatee or creditor of the absentee, Mrs. Lemoine is without power to accept and claim the legacy already referred to."

Testamentary dispositions do not fall because the instituted heir or legatee happens to be absent, when the testator's succession is opened. C. C. 1700, 1703, 1705. Absence cannot—of itself—be considered as an incapacity to receive by donation, and the executors of Blineau's will, whose functions were to discharge the legacies, could not—by a proceeding in which Eugène Lemoine, who survived the testator, was not represented, transmit to his presumptive heirs his share of the deceased's succession.

As we are satisfied that Eugène Lemoine was seen and was alive after the death of Olivier Blineau, the legacy in his favor, which is one under a particular title, gave him, to the property bequeathed, a right. which—from the death of the testator—he could have transmitted either by an act *inter vivos* or *mortis causa*, or by succession; and that property—his title to which never was divested—forms a part of his estate, and was properly placed under the administration of his curatrix and wife, his partner in the matrimonial community.

C. C. 1626 (1619); Marcadé, vol. 4, p. 87, 127; C. C. 64, (65); 47 (50); 48, (51).

Were it true that—though the creditors of an heir can be authorized to accept, in his name and stead, the inheritance which he renounces or refuses to accept, the wife and curatrix of an absentee is denied that privilege, it would not follow that, on that account, the legacy to Eugène Lemoine has lapsed, and that, because of his absence—his inheritance has devolved upon those who had a concurrent right to a joint legacy.

It is, however, useless to discuss this point. The Civil Code provides "that the curator of an absentee is bound, with respect to his administration, by the same obligations and responsibility by which tutors are bound, and the tutor may accept legacies, donations and other advantages made to his ward." Besides, the paramount object of legislation is to protect and preserve for all—as well for an absentee as for the child who is yet in his mother's womb—the rights which spring from its. enactments.

C. C. 50, (53); 354, (349); 29, (29); C. P. 109.

The only doubt which induced us to re-examine this important cause, has been dispelled by the last trial, and—notwithstanding the able and remarkable defence twice presented by appellant's counsel, we still believe that the judgment of the lower court is correct. .

It is, therefore, ordered that our former decree remain undisturbed.